For reasons stated in the memorandum provided to the parties, we affirm. Rule 84.16(b).

STATE of Missouri, Respondent,

v.

John David SIMRIN, Appellant.

No. SD 31268.

Missouri Court of Appeals,
Southern District,
Division One.

Nov. 14, 2012.

Rosalynn Koch, of Columbia, MO, for Appellant.

Chris Koster, Attorney General and Robert J. Bartholomew, Assistant Attorney General, of Jefferson City, MO, for Respondent.

WILLIAM W. FRANCIS, JR., J.

John David Simrin ("Simrin") appeals his conviction for one count of the class A felony of robbery in the first degree, a violation of section 569.020.[1] Following a jury trial, Simrin was sentenced by the trial court to twenty years in the Missouri Department of Corrections. In his two points on appeal, Simrin asserts the trial court erred in convicting him of the charged offense because there was insufficient evidence of his use of a "dangerous instrument" and plainly erred in failing to hold a witness, who was a law enforcement officer, "in contempt, striking his testimony, granting a mistrial, or taking some corrective action within its discretion[.]" We affirm the judgment and sentence.

**Factual and Procedural Background**

Viewing the evidence in a light most favorable to the verdict, *State v. Neal*, 328 S.W.3d 374, 379 (Mo.App. W.D.2010), the record reveals that on April 16, 2009, Andrew Dickinson ("Dickinson"), an Army National Guard service member on leave from deployment in Iraq, along with his wife, two children, and the family's dog, traveled to Springfield, Missouri, to visit

---

1. All statutory references are to RSMo 2000.

relatives. While visiting Springfield, the family went to an ATM machine at the State Bank of Southwest Missouri to get cash. While getting $20 from the machine, Dickinson noticed Simrin walk across the bank parking lot and then alter his direction to walk "straight ... towards" the Dickinson's vehicle. Simrin walked up "[t]o [the] driver's window[,]" "stuck something through the window and said, 'Give me the money.'" Dickinson "handed him the $20" because he "couldn't tell at the time what [Simrin] had in his hand; if it was a gun, what kind of weapon it was, if anything." Dickinson testified consistent with his training—he kept his eyes on Simrin's eyes and not his hands. Dickinson related he handed over the cash because he did not want to "take any chances with this guy" as he had his "kids in the car." He stated he would not have given the money to Simrin if he had not believed Simrin had a weapon. Of the incident, Dickinson said that he was scared "[n]ot for [himself], [but] for [his] children" and that he believed at the time Simrin had a gun or a taser.

After getting the $20 bill from Dickinson, Simrin then demanded "all the money" and Dickinson told him "to check out [his] plates, that [he] was from out of state, and [he] had been traveling and had reached [his] maximum withdrawal for the day." Simrin then walked away from the Dickinson vehicle and through the parking lot toward the back of the bank. Dickinson gave his wife his cell phone so that she could call the authorities and Dickinson decided he "was going to stop [Simrin]." Not knowing "what kind of weapon, if any,

that [Simrin] had, [or] what it was he had in his hand[,]" Dickinson, lacking a weapon, "used [his] vehicle, and ... ran [Simrin] over." When Simrin rolled up "on the hood" of the car and then hit the ground, his cell phone went "flying from somewhere, out of his hand, pocket, one of the two." Dickinson exited the vehicle as Simrin was getting up off the ground and a verbal altercation ensued between the two men. At some point during the quarrel, Simrin returned the $20 bill to Dickinson. As passersby started to gather, Simrin exited the parking lot on foot and ran across the street toward an apartment complex where he entered one of the apartments.

The police arrived on the scene shortly thereafter, were given a description of Simrin, and recovered the cell phone dropped by Simrin in the parking lot. No weapon was found on the scene, and Dickinson later stated that under normal circumstances he would not have mistaken a cell phone for a weapon, but in this instance his response was to protect his family because he believed they were in danger. "Police resources" were utilized to determine the cell phone was registered to Simrin's daughter and surveillance footage was used to identify Simrin as the suspected robber. A photographic line-up was e-mailed to Dickinson, who had by then returned to Iraq, and Dickinson picked Simrin's photo from the photographic array. Simrin was then arrested and interviewed by Detective Chris Barb ("Detective Barb"). During the interview, Simrin "denied remembering anything about th[e] incident[.]"[2]

---

**2.** Later, Simrin wrote a letter to the Attorney General's office which stated:

. . . .

April 16, 2010, I approached a man and asked to bum a couple bucks. Well, he gave me $20, and I said "All of it?" like you want me to have the whole thing. Well, he

said "Here," and he handed me $20, I walked away.

When I got to the back of the parking lot, all of a sudden, bang, someone ran me over. It was him, the guy who gave me $20. I was dizzy. He got out and he took the money.

On January 10, 2011, a two-day jury trial was held. Prior to trial, the trial court sustained Simrin's motion in limine to preclude the State from referring to any prior misconduct or crimes on the part of Simrin. During the State's direct examination of Detective Barb, the following occurred:

[The State:] [A]fter you get the information back saying that it was Simrin, what did you do then?

[Detective Barb:] I attempted to locate a possible address for ... Simrin and, in doing so, I contacted his probation and parole officer.

[Simrin's Counsel:] Objection, Your Honor. If we could approach, please.

### COUNSEL APPROACHED FOR A SIDEBAR

[The State:] That was not what I intended on him saying, and I was not planning on going down that line of questioning, and I'm done going down that line of questioning.

[Simrin's Counsel:] Your Honor, obviously my objection is to the probation and parole comment. I'm not sure— you know, I'm going to say for the record that I don't believe asking the jury to disregard that is going to be effective at this point. The jury now knows that he has a criminal record of some kind, which not only goes against the motion in limine, but it's objectionable on so many levels, and I would ask for a mistrial at this point.

[The State:] I completely agree it's objectionable, and I didn't intend on going that far and did not plan on him saying anything even close to that.

[The Court:] I'm going to take it under advisement. Let's finish the witness. We'll talk about it after the jury's

gone. It's—it creates an issue that I agree that you agreed not to get into, which has to do with the priors. But let's finish the witness and get the jury out of here, and then I'll think about it and we can talk about it when they are gone.

[The State:] Even though it's under advisement, did you want to give a limine instruction?

[Simrin's Counsel:] I would ask for a [limiting] instruction. But I would also—

[The Court:] Go off the record.

(Off-the-record discussion.)

[The Court:] Okay. My intent is to go out and sustain the objection and to tell the jury to disregard the last answer. [Simrin's Counsel,] do you have an additional request of the [c]ourt?

[Simrin's Counsel:] I would ask for a limiting instruction as far as the last answer, Your Honor.

[The Court:] Telling them to disregard it and to explain or—I'll deny your request to go that far with it. I will give the—what I've said, objection is sustained and the answer's stricken, and then we'll go there—and I'll take under advisement the motion for mistrial.

[Simrin's Counsel:] Thank you, Your Honor.

### PROCEEDINGS RETURNED TO OPEN COURT

[The Court:] I will sustain the objection by the defense and order that the last answer be stricken.

When the issue was later revisited, counsel for Simrin renewed her motion for mistrial

Well, I got up and went home. [Approximately] [a] month ... later I was arrested for first degree robbery. I did not rob him.

I've been here since June 2nd of 2010. The only thing I'm guilty of is stupidity for trying to bum money.

and, in denying that motion, the trial court reasoned:

> I will note that it—because of the nature of this case, and your client not testifying, I had thought about it more than if he was going to testify anyway, if there were other things that were going on. But I do think it's a drastic remedy. I've read the transcript, I've read the cases.
>
> I don't know if the jurors know that he was on probation, that he actually had a prior, or that this is just part of when you are charged with a crime and—so I don't know that they know the significance that we know about what that means.
>
> So at this time I will overrule your motion for a mistrial.

Simrin did not testify nor present any evidence at trial. At the close of all the evidence, Simrin was convicted of robbery in the first degree and was sentenced as set out above. This timely appeal followed.

The issues presented for our determination are:

1. Did the trial court err in overruling Simrin's motion for judgment of acquittal and in convicting him of robbery in the first degree in that there was insufficient evidence "the cell phone [Simrin] was holding appeared to be a dangerous instrument...."

2. Was there error by the trial court's failure to act "when Detective Barb unresponsively testified that he checked with [Simrin's] parole officer, by either holding him in contempt, striking testimony, granting a mistrial, or taking some corrective action within its discretion ... [?]"

## Point I: Substantial Evidence to Support the Conviction

### Standard of Review

 In reviewing a challenge to the sufficiency of the evidence, this Court must determine whether sufficient evidence permits a reasonable juror to find guilt beyond a reasonable doubt. *State v. Belton,* 153 S.W.3d 307, 309 (Mo. banc 2005). We view the evidence and all reasonable inferences therefrom in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the jury's verdict. *Id.* Evidence is sufficient to support guilt if any reasonable inference supports guilt, even if other equally valid inferences do not. *State v. Breedlove,* 348 S.W.3d 810, 814 (Mo.App. S.D.2011). " 'The trier of fact determines the credibility of the witnesses, and may believe all, some or none of the testimony of a witness.' " *State v. Edwards,* 280 S.W.3d 184, 189 (Mo.App. E.D.2009) (quoting *State v. Burse,* 231 S.W.3d 247, 251 (Mo.App. E.D. 2007)). "The credibility and the effects of conflicts or inconsistencies in testimony are questions for the jury, and the appellate court will not interfere with the jury's role of weighing the credibility of witnesses." *State v. Coleman,* 263 S.W.3d 680, 683 (Mo.App. S.D.2008). " 'The function of the reviewing court is not to reweigh the evidence, but only to determine if the evidence is supported by sufficient evidence.' " *Edwards,* 280 S.W.3d at 189 (quoting *Burse,* 231 S.W.3d at 251). " 'This same standard of review applies when reviewing a motion for a judgment of acquittal.' " *State v. Browning,* 357 S.W.3d 229, 233 (Mo.App. S.D.2012) (quoting *State v. Botts,* 151 S.W.3d 372, 375 (Mo.App. W.D.2004)).

### Analysis

A person commits the crime of robbery in the first degree if "he forcibly steals property and in the course thereof he ...

[d]isplays or threatens the use of what appears to be a ... dangerous instrument." § 569.020.1(4). The term "[d]angerous instrument" is defined in section 556.061(9) as "any instrument, article or substance, which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury[.]"

What is distinctive about the crime of robbery is " 'the taking of the property of another by violence or by putting the victim in fear.' " *State v. Saucy,* 164 S.W.3d 523, 527 (Mo.App. S.D.2005) (quoting *State v. Day,* 560 S.W.2d 322, 323 (Mo.App. St.L.D.1977)). "Fear of immediate injury, however, need not be expressly shown[,]" and "[a] presumption of fear will arise from evidence showing some reasonable grounds therefor." *Day,* 560 S.W.2d at 323. For example, "[c]ompliance with the demands of the robber is indicative of the victim's fear of the consequences which could have resulted had he ... not complied." *Saucy,* 164 S.W.3d at 527. Further, " '[r]obbery in the first degree may be found where the victim is in fear even though there was no real possibility of injury[ ]' " and "[t]he fact that a victim perceives there to be a weapon that remains unseen is sufficient whether or not, in fact, such a weapon exists." *State v. Archer,* 814 S.W.2d 315, 317 (Mo.App. S.D. 1991) (quoting *State v. Collins,* 567 S.W.2d 144, 146 (Mo.App. St.L.D.1978)). "Whether or not the object that is perceived as a deadly weapon or dangerous instrument is in fact capable of producing harm is unimportant. The threat to use the object to produce harm transmogrifies it into a dangerous instrument." *Id.; see also Lewis v. State,* 24 S.W.3d 140, 144 (Mo.App. W.D. 2000) (citing a series of cases which held "the State does not have to show that the defendant actually possessed a dangerous instrument, only that there was evidence from which the fact finder could reasonably conclude that the victim believed that the defendant was threatening its use.").

Here, Simrin essentially argues that to be convicted of robbery in the first degree he had to have directly threatened or displayed a dangerous instrument to Dickinson, which he did not do. He asserts the surveillance videotape makes it clear he was holding a cell phone and not a dangerous instrument such that his conviction should not stand. However, the fact that Simrin was not carrying a dangerous instrument is immaterial based on the facts of this case. Simrin approached Dickinson's vehicle and "stuck something through the window and said, 'Give me the money.' " Dickinson testified he gave the cash to Simrin because he "couldn't tell at the time what [Simrin] had in his hand ... if it was a gun, what kind of weapon it was, if anything[;]" he did not want to "take any chances with this guy" in that his "kids [were] in the car[;]" he would not have given the money to Simrin if he had not believed Simrin had a weapon; during the incident he was scared "[n]ot for himself, [but] for [his] children[;]" and he believed at the time Simrin had a gun or a taser.[3] As stated above, we defer to the jury on

---

**3.** As an aside, we note that it matters not that Simrin returned the $20 bill to Dickinson at the scene of the incident. The distinctive characteristic of robbery is "violence to the victim." *State v. Gridiron,* 180 S.W.3d 1, 5 (Mo.App. E.D.2005). As the Supreme Court stated in *State v. Wright,* 476 S.W.2d 581, 584 (Mo.1972), "[t]he essence of the offense of robbery is the taking of the property of another from the person by violence or by fear; the ownership [or retention] of the property is not material to and does not affect the offense." The crime of robbery is complete and consummated when the defendant gains control of the item "even for a moment" and there is no requirement that the item be retained by the defendant. *State v. Bradshaw,* 766 S.W.2d 470, 473 (Mo.App. W.D.1989); *see also State v. Charles,* 537 S.W.2d 855, 857 (Mo.App. K.C.D.1976).

issues of witness credibility. *Coleman,* 263 S.W.3d at 683. The evidence is sufficient whereby a reasonable juror could have concluded Dickinson believed Simrin was threatening to use a dangerous instrument, even though he did not see such an instrument and such an instrument ultimately did not exist. The trial court did not err in overruling Simrin's motion for judgment of acquittal and in convicting him of robbery in the first degree. Point I is denied.

### Point II: Error Relating to Detective Barb's Testimony

 Here, Simrin's motion for new trial claimed the trial court "erred in not granting [Simrin's] request for a mistrial after [Detective Barb] testified that he contacted [Simrin's] parole officer" because such "statements are evidence of prior bad acts in a case where [Simrin] did not testify[ ]" and counsel for Simrin had "requested to keep out such statements in a pre-trial Motion in Limine." The motion went on to maintain

> [t]hough [the trial court] sustained the objection by [defense counsel] to the testimony [of Detective Barb], it was not sufficient to prevent or correct the prejudice [Simrin] suffered. Furthermore, [the trial court], refused [Simrin's] request to give a limiting instruction to the jury at the time of the testimony, agreeing only to take the request for mistrial under advisement. Once the State was prepared to rest, [the trial court] denied the request for mistrial and offered to give the jury a limiting instruction. However, an instruction at that time would be insufficient to cure the prejudice to [Simrin]. An instruction after the State rested, and after the testimony of the officer was complete, would serve only to draw more attention to [Simrin's] criminal history and would further dam-

age [his] case to the jury. By that point, the damage and prejudice had occurred and could not be undone.

Simrin asserted the "[f]ailure by the [c]ourt to give a limiting instruction at the time the testimony occurred, and the further failure to grant a mistrial, deprived [Simrin] of his due process rights...." His point relied on presented to this Court asserts: "[t]he trial court plainly erred in not acting when Detective Barb unresponsively testified that he checked with appellant's parole officer, by either holding him in contempt, striking his testimony, granting a mistrial, or taking some corrective action within its discretion[.]" (ab 19) It is readily apparent that several of the claims set out in Simrin's point relied on were not included in his motion for new trial. Save for exceptions not applicable here, allegations of error in a jury-tried case must be included in a motion for new trial to be preserved for appellate review. Rule 29.11(d).[4] As such, it appears only Simrin's challenge to the trial court's denial of his request for a mistrial is preserved for appellate review and his other claims relating to the trial court's failure to hold Detective Barb "in contempt, striking his testimony ... or taking some corrective action within its discretion" are only reviewable, if at all, for plain error. Rule 30.20. Although Simrin's point is multifarious and in violation of rule 84.04, we *ex gratia* consider the merits here. *State v. Lutz,* 334 S.W.3d 157, 164 n. 2 (Mo.App. S.D.2011). Based on the differing standards of review for the claims found under this point relied on, we shall address them separately.

### Denial of Motion for Mistrial

#### Standard of Review

 First, we will discuss Simrin's preserved claim relating to the denial of

---

4. All rule references are to Missouri Court Rules (2012).

his request for a mistrial. " 'A trial court's decision not to grant a mistrial is given 'enormous discretion' on appeal.' " *State v. Benedict*, 319 S.W.3d 483, 487 (Mo.App. S.D.2010) (quoting *State v. Hahn*, 37 S.W.3d 344, 354 (Mo.App. W.D.2001)). "Abuse of discretion only occurs if 'a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration.' " *Id.* (quoting *State v. Kemp*, 212 S.W.3d 135, 145 (Mo. banc 2007)). "If reasonable minds could differ on the propriety of the ruling, no abuse of discretion has occurred." *Id.*

## Analysis

Here, after counsel for Simrin objected to Detective Barb's statement relating to contacting Simrin's probation and parole officer, the trial court heard arguments from counsel, announced to the jury that it was sustaining the objection, and ordered the answer stricken. When counsel for Simrin later renewed her motion for mistrial, the trial court reasoned such a statement did not specifically tell the jurors Simrin was on probation or had a prior conviction, and the trial court was not sure if the jurors would merely believe that having a probation and parole officer was "just part of when you are charged with a crime" such that the jurors likely did not know the significance of such a reference. As a result, the trial court exercised its discretion in denying the motion for mistrial. "It is not an uncommon occurrence at trial for a witness to unexpectedly volunteer an inadmissible statement[ ]" such that, as the trial court "has observed the event that led to the request for a mistrial, it is in the best position to determine whether the incident had a prejudicial effect on the jury[,]" as well as to determine the appropriate measure to remedy the situation. *State v. Mahoney*, 70 S.W.3d 601, 606 (Mo.App. S.D.2002). The reference to Simrin's probation and parole officer was brief. It was an issue that was not repeated at any time during the trial or in closing arguments. Additionally, save for her request for a limiting instruction, which was denied by the trial court, counsel for Simrin requested no other relief or corrective action, a fact that "dulls any inclination" to find any abuse of discretion on the part of the trial court. *State v. Smith*, 934 S.W.2d 318, 321 (Mo. App. W.D.1996). The trial court did not err in denying Simrin's request for a mistrial.

### *Plain Error as to Other Corrective Actions*

#### Standard of Review

Plain-error review is discretionary and involves a two-step analysis. *State v. Jennings*, 322 S.W.3d 598, 601 (Mo.App. S.D.2010). First, this Court considers the facts and circumstances to facially determine if there was plain error— meaning "evident, obvious and clear" error. *Id.* Only if this Court identifies plain error do we proceed to the second step of determining whether manifest injustice, or a miscarriage of justice resulted. *Id.* Appellant has the burden to establish the trial court committed plain error, and that there has been a manifest injustice or a miscarriage of justice. *State v. Royer*, 322 S.W.3d 603, 606 (Mo.App. S.D.2010). Such review is to be used sparingly and does not justify review of every alleged trial error that has not been properly preserved. *State v. Taylor*, 166 S.W.3d 599, 610 (Mo. App. S.D.2005).

#### Analysis

Simrin's argument is essentially that the trial court erred in failing to *sua sponte* hold Detective Barb in contempt, strike his testimony, or take some other action to preserve the constitutional rights he asserts were violated by the testimony

at issue. While citing no case law requiring a trial court to take such actions of its own volition in a factually similar case, he also fails to state how taking any of the aforementioned suggested steps would have had any curative effect on the testimony of which he complains. The trial court evaluated the situation at the time the testimony occurred, it heard argument from both sides and it took corrective action by striking the answer. Simrin has the burden of proof and he has failed to prove there was error in this matter. *Royer*, 322 S.W.3d at 606. In that Simrin has failed to establish plain error, we need not proceed to the second step of plain-error review. *See Jennings*, 322 S.W.3d at 601. The trial court did not plainly err in choosing not to take other remedial action when the testimony of Detective Barb was elicited at trial. Point II is denied.

The judgment and sentence is affirmed.

GARY W. LYNCH, P.J. and NANCY STEFFEN RAHMEYER, J., concur.